Case 1:24-cv-00010   Document 53   Filed 02/27/25   Page 1 of 17

FILED
Clerk
District Court
FEB 27 2025
for the Northern Mariana Islands
By_____JP_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| STAR MARIANAS AIR, INC, <br><br>Plaintiff,<br>v.<br><br>SOUTHERN AIRWAYS EXPRESS, LLC, MARIANAS PACIFIC EXPRESS, LLC d/b/a MARIANAS SOUTHERN AIRWAYS, and KEITH STEWART,<br><br>Defendants. | Case No. 1:24-cv-00010<br><br>MEMORANDUM DECISION DENYING IN PART, AND GRANTING IN PART SOUTHERN AIRWAYS EXPRESS, LLC'S MOTION TO DISMISS |

This matter came before the Court for a hearing on Defendant Southern Airways Express LLC's ("Southern Airways") Motion to Dismiss ("Mot.," ECF No. 15) causes of action I and II of Plaintiff Star Marianas Air, Inc.'s ("Star Marianas") Complaint (ECF No. 1) pursuant to Federal Rules of Civil Procedure 12(b)(6)-(7), and 19. (Mins., ECF No. 33.)

Southern Airways asserted the Court should dismiss the Complaint for two reasons: the Complaint challenges state-action that is subject to the *Parker* Immunity Doctrine, and it failed to join a necessary and indispensable party, the Commonwealth of the Northern Mariana Islands ("CNMI"). ("Mem." 5-6, ECF No. 15-1.) Southern Airways supported its Motion with a Memorandum (*id.*) and attached its Corporate Disclosure Statement (ECF No. 15-2). Co-Defendants Marianas Pacific Express, LLC d/b/a Marianas Southern Airways ("MSA") and Keith Stewart joined in Southern Airways's Motion. (ECF No. 16.) Plaintiff Star Marianas filed an Opposition (ECF No. 28), to which Southern Airways replied (Reply, ECF No, 29). MSA and Stewart again joined Southern Airways's Reply. (ECF No. 30.)

After reviewing the filings, considering the legal authorities, and hearing oral argument at the hearing, the Court denied Southern Airways's Motion under Rule 12(b)(6) but granted its Motion pursuant to Rules 12(b)(7) and 19(a)(1)(A) with leave for Plaintiff to amend its complaint. (Mins. 1) The Court details its reasoning herein.

I.    FACTUAL AND PROCEDURAL BACKGROUND

Beginning in early 2020, the United States economy was severely impacted by the COVID-19 worldwide pandemic. (Compl. ¶ 34.) In March 2021, President Joseph Biden signed the American Rescue Plan Act ("ARPA") of 2021. (*Id.* ¶ 36.) *See* Pub. L. 117-2 (Mar. 11, 2021).

Congress' stated purpose for the funds to be disbursed under ARPA "were to relieve certain households, small businesses, non-profits, and 'impacted industries such as tourism, travel, and hospitality.'" (Compl. ¶ 37 (quoting ARPA § 9901).)[1]

For a period of about nine months, from August 2022 to April 2023, MSA existed as the main competitor of Star Marianas in the CNMI, and Star Marianas was the primary provider of commercial passenger flights between the islands of Saipan, Rota, and Tinian. (*Id.* ¶ 16.) MSA was a joint venture affiliated with Southern Airways. (*Id.* ¶ 19.) Keith Stewart was Director and President of MSA. (*Id.* ¶¶ 4, 11.)

On March 10, 2022, David DLG. Atalig, Secretary of Finance, sent a letter to Francisco C. Aguon, Acting Director, Division of Procurement Services, Department of Finance ("DOF"), requesting approval to execute a sole source contract with MSA pursuant to sections 70-30.3-215 and 70-30.3-225 of the Procurement Regulations. (Letter, Ex. E to Compl., ECF No. 1-5.) The Letter details the scope of the contract as providing inter-island scheduled and chartered air

---

[1] Paragraph 37 of the Complaint states ARPA § 9901 "enact[ed] 42 U.S.C. § 602, § 603," but the two sections were codified at 42 U.S.C. §§ 802, 803.

and cargo services between the islands at set rates as well as provide for additional considerations. (*Id.* at 2.)

Secretary Atalig stated that the requirements under 70-30.3-215(a) and 70-30.3-225(b) are met through the proposed contract. (*Id.* at 2-3.) The Letter details the purpose of the contract as providing inter-island scheduled and chartered air and cargo service between the islands at set rates as well as provide for additional considerations. (*Id.* at 1, 3.) Further, the Letter states there was only one airline, Star Marianas, that provided commercial passenger flights between the islands and only one airline—United Airlines—that provided commercial passenger flights between Guam and Saipan. (*Id.* at 3-4.) The contract would provide tourists a secondary accommodation option and additional flight schedules, and therefore assist the islands commercial activities that were detrimentally impacted due to the COVID-19 pandemic. (*Id.* at 3, 6.) Secretary Atalig states that Star Marianas has expressed that they lack resources, staffing, and capacity to increase flights to and from Saipan and the other islands. (*Id.* at 3.) Additionally, the CNMI has pursued other avenues to meet the critical need of air-transportation but nothing has materialized. (*Id.*) Star Marianas temporarily suspended flights between the CNMI, which caused unease of residents from the islands of Rota and Tinian. (*Id.* at 4.) The Letter states, "[t]he monopoly airline's hasty suspension of its inter-island commercial flights within the CNMI caused the utmost concern for the Rota and Tinian medical referral patients reliant on STAR Marianas Air's flight schedule . . . ." (*Id.*) Because Star Marianas has also canceled flights unexpectedly, due to the lack of options for air-transportation across the islands, the contract will provide for more dependable interisland travel options. (*Id.*) The Letter states that the services are not unnecessarily duplicative. (*Id.*) The Letter discusses MSA's qualifications. (*Id.*) Further, the Letter states the terms of the contract and its reasonableness. (*Id.* at 4-5.) The Letter concludes by seeking approval for the Governor to enter into the sole source contract with MSA. (*Id.* at 7.)

On March 21, 2022, Acting Director Aguon issued a Memorandum stating that pursuant to NMIAC section 70-30.3-115(g)(1) of the Procurement Regulations, processing was complete, and that contract implementation may proceed. (Mem., Ex. C to Compl., ECF No. 1-3.) On that same day, MSA executed a sole source contract, otherwise known as the Airline Incentive Agreement (the "Contract"), with the CNMI government for receipt of federal funds through ARPA. (Compl. ¶ 10; Contract 1, Ex. A to Compl., ECF No. 1-1.) Stewart approved and signed the Contract on behalf of MSA as its Director and President, and David DLG. Atalig, Secretary of Finance signed on behalf of the CNMI DOF as the expenditure authority. (Compl. ¶ 11; Contract 2, 5.) Additionally, a number of other CNMI officials signed the Contract including Attorney General Edward Manibusan, Governor Ralph Deleon Guerrero Torres, and Acting Director Aguon. (Contract 6-7.)

The Contract provides for an incentive framework that includes an Initial Incentive Fund, a Flight Incentive Program, and Government Related pricing. (Compl. ¶ 28 (citing Contract 2).) The Airline Incentive Framework's recitals state that the recent temporary closure of Star Marianas demonstrated the vulnerability of the CNMI economy to only have one air carrier in the CNMI; through the use of ARPA funds, the CNMI can incentivize MSA to begin operations. (Airline Incentive Framework 2, Ex. B to Contract; ECF No. 1-6.) The Incentive Agreement includes the CNMI providing start-up funding and per flight incentive funding for a set period of time and in return, MSA agrees to operate certain flights at set rates as well as provide other considerations. (*Id.*) The CNMI would provide MSA $1.5 million in ARPA sourced funding for start-up costs with conditions. (*Id.*) MSA agreed to offer a minimum of forty-two weekly departures serving Saipan, Tinian, Rota, and Guam. (*Id.* at 3.) MSA further agreed that for the first six months of the incentive period—which is a period of eighteen months after the first flight scheduled in June 2022—it will offer flights at the following rates:

>Saipan to/from Guam: $99.00
>Saipan to/from Tinian: $39.00
>Saipan to/from Rota: $69.00
>Rota to/from Guam: $69.00

(*Id.*). Additionally, MSA agreed to government related pricing for at least the incentive period. (*Id.* at 4.) In return, the CNMI would provide set pre-flight/departure incentive funding during the incentive period—the amount provided varied depending on departure and arrival destinations. (*Id.* at 3.)

To claim the incentive money, MSA would submit a report to the CNMI within fifteen days of the end of the month listing the number of flights for the prior month and the incentive amount. (*Id.*) After receipt, the CNMI would have thirty days to verify the authenticity of the claims and thereafter the CNMI would immediately remit the total incentive amount for the month. (*Id.*)

Stewart alleged that the Contract would reduce airfare and help the CNMI economy. (Compl. ¶ 41.) The framework stated MSA would provide over 10,000 passenger flights and save nearly $600,000 through reduced airfares. (*Id.*) Star Marianas estimates that it lost $100,000 per month in revenue with a total loss of revenue estimated between $1.5 to $2 million. (*Id.* ¶ 42.)

Star Marianas brings separate causes of action for two violations of the Sherman Act. The first is under 15 U.S.C. § 1, against Southern Airways (*id.* ¶¶ 44-52 (Count I)), MSA (*id.* ¶¶ 63-81 (Count III)), and Keith Stewart (*id.* ¶¶ 102-21 (Count V)); and the second is under 15 U.S.C. § 2, against Southern Airways (*id.* ¶¶ 53-62 (Count II)), MSA (*id.* ¶¶ 82-101 (Count IV)), and Keith Stewart (*id.* ¶¶ 122-141 (Count VI)).

Star Marianas requests the Court permanently enjoin and restrain all three Defendants from establishing any similar agreements unreasonably restricting competition and conspiracy to monopolize the CNMI airline industry in violation of sections 1 and 2 of the Sherman Act.

(*Id.* at Prayer for Relief.) Additionally, Star Marianas seeks an award for actual damages against them jointly and severally for violations of sections 1 and 2 of the Sherman Act, in an amount to be determined at trial. (*Id.*) Third, Star Marianas requests for an award of treble damages, prejudgment interest, and reasonable attorneys' fees, and costs against the three Defendants jointly and severally. (*Id.*) Finally, Star Marianas asks for such other relief as the Court may find just and proper. Defendant Southern Airways moved to dismiss the complaint pursuant to Rule 12(b)(6) based on the *Parker* Immunity, as well as Rules 12(b)(7), and 19 of the Federal Rules of Civil Procedure for Plaintiff's failure to join the CNMI. The Court addresses these arguments in turn.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations need not be detailed, but a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. "For purposes of ruling on a Rule 12(b)(6) motion, the Court 'accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party.'" *P&G v. QuantifiCare Inc.*, 288 F. Supp. 3d 1002, 1010 (N.D. Cal. 2017) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). In determining whether a motion to dismiss should be granted, there is a two-step process: first, "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Generally, when ruling on a 12(b)(6) motion, a court may consider only the pleadings and limited materials, such as "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). If a court considers other evidence, "it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *Id.* at 907.

As done here, "[w]hen a defendant is sued under a statute that he believes was never meant to apply to him, he may move to dismiss for failure to state a claim on which relief can be granted. His motion would then be granted if the court could not reasonably infer his liability under that statute." *SolarCity Corp. v. Salt. River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 726 (9th Cir. 2017) (citing *Ashcroft*, 556 U.S. at 678).

## B. *Parker* Immunity

Southern Airways's Rule 12(b)(6) motion to dismiss relies on the *Parker* Immunity doctrine ordinarily asserted by a state. "State-action immunity was first recognized in *Parker v. Brown*" where a California raisin producer alleged that a state commission, which set supra-competitive raisin prices, violated federal antitrust law. *Id.* at 724 (citing *Parker v. Brown*, 317 U.S. 341 (1943)). The U.S. Supreme Court assumed the state's pricing program would violate federal antitrust law if it had been privately operated and also that Congress could have prohibited California from setting such prices. *Id.*

> But because the commission "derived its authority … from the legislative command of the state" and "nothing in the language of the Sherman Act or in its history … suggest[ed] that its purpose was to restrain a state … from

activities directed by its legislature," the Court held that the commission's price-setting did not violate antitrust law. *Id.*

Because Southern Airways is not a state, it relies on the Supreme Court's "*Midcal*'s two-pronged test [that is] applicable to private parties' claims of state action immunity." *S. Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 61 (1985) (citing *Cali. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992) (In *Midcal*, "we announced the two-part test applicable to instances where private parties participate in a price-fixing regime.")

Under *Midcal*, first, the challenged restraint must be "clearly articulated and affirmatively expressed as state policy." *Id.* Second, the policy must be "actively supervised" by the State itself. *S. Motor Carriers Rate Conf., Inc.*, 471 U.S. at 56 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978)). Although prior precedent states "[i]t is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign," *Midcal*, 445 U.S. at 104 (quoting *Goldfarb*, 421 at 791), the Supreme Court in subsequent caselaw—*Southern Motor Carriers Rate Conference, Inc.*—stated that

> the Court abandons the settled view that a private party is not entitled to state-action immunity unless the State compelled him to act in violation of federal law. . . . [A] State may exempt price fixing from the federal antitrust laws if it *clearly articulates its intention to supplant competition with regulation in the relevant market* and if it actively supervises the unlawful conduct by evaluating the reasonableness of the prices charged.

471 U.S. at 74 (emphasis added).

As to the first prong under *Midcal*, the state policy must be permissive. *Id.* at 60, 60 n.23. "[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful. . . ." *Parker*, 317 U.S. at 351-52; *Midcal*,

445 U.S. at 104. Further, "[a]s long as the State as sovereign clearly intends to displace competition *in a particular field* with a regulatory structure, the first prong of the *Midcal* test is satisfied." *S. Motor Carriers Rate Conf. Inc.*, 471 U.S. at 64.

**C. Federal Rule of Civil Procedure 12(b)(7) and 19**

In addition to relying on Rule 12(b)(6), Southern Airways also asserts Star Marianas failed to join the CNMI as a party under Rule 19 is a defense under Rule 12(b)(7). Rule 19 provides a three-step process for the Court to determine if an action should be dismissed for failure to join a "purportedly indispensable party." *United States v. Bowen*, 172 F.3d 682, 688 (1999).

First, the court must determine if the absent party is "necessary." *Id.* A necessary party is one required under Rule 19. *See id.* Rule 19 dictates,

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in the person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect that interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Second, if the absent party is "necessary," the court must determine whether joinder is "feasible." *Bowen*, 172 F.3d at 688.

Third, if joinder is not "feasible," the court must decide whether the absent party is "indispensable" or in other words, whether an action can continue without the party in "equity and good conscience." *Id.* (quoting Fed. R. Civ. Proc. 19(b)). A court considers the following factors in determining if an action may proceed without a party in equity and good conscience:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>     (A) protective provisions in the judgment;

```
                    (B) shaping the relief; or
                    (C) other measures;
            (3) whether a judgment rendered in the person's absence would be adequate;
            and
            (4) whether the plaintiff would have an adequate remedy if the action were
            dismissed for nonjoinder.
```

Fed. R. Civ. Proc. 19(b)(1)-(4).

### III. ANALYSIS

Southern Airways argues, and the other Defendants join, that the Complaint against them must be dismissed because the action Star Marianas challenges is state action that is subject to *Parker* immunity. (Mem. 5-6.) Additionally, Southern Airways argues that the Complaint must be dismissed pursuant to Rule 12(b)(7) and Rule 19 because Star Marianas failed to join a necessary and indispensable party—the CNMI. (*Id.* at 6.)

In opposition to the motion, Star Marianas argues that *Parker* Immunity is not a proper subject for a motion to dismiss. (Opp'n 1-2.) Next, Star Marianas argues that the two requirements for *Parker* Immunity cannot be met because (1) there is no clearly articulated state policy to create a monopoly in airline travel, (2) a state policy to restrict airline competition would violate the Federal Aviation Act of 1958, (3) there was not active supervision of the anticompetitive action by the CNMI, and (4) state action immunity is disfavored. (*Id.* at 3-5.) Additionally, Star Marianas argues that Southern Airways cannot show that the CNMI is an indispensable party to the action. (*Id.* at 6-7.) Southern Airways responds by arguing that *Parker* Immunity is appropriate at the motion to dismiss stage. (Reply 3-4.) Further, Southern Airways argues that both prongs of the *Parker* immunity doctrine are met. (*Id.* at 4.) The Court finds that, based on the facts alleged in the Complaint, Defendants are not entitled to *Parker* Immunity, but dismissal is appropriate for the Complaint's failure to join the CNMI.

### A. *Parker* Immunity

District courts and the Ninth Circuit have considered whether *Parker* Immunity applies at the motion to dismiss stage. In *Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007), the Ninth Circuit considered whether a district court properly dismissed an action due in part to *Parker* immunity at the motion to dismiss stage. 504 F.3d at 915, 919. The Ninth Circuit ultimately ruled that the district court properly considered and dismissed the lawsuit in accordance with *Parker* immunity. *Id.* at 919. This Court therefore considers whether *Parker* Immunity warrants dismissal at this stage of the proceedings and determines it does not.[2]

### i. First Prong of *Parker* Immunity: Clearly Articulated State Policy

Defendants argue that the Contract falls squarely within *Parker* Immunity because the CNMI entered into the Contract based on the Procurement Regulations and the CNMI made clear what the purpose of the agreement was. (Mem. 8, 11-12; Reply 5.) Four different CNMI government officials signed the Contract, and therefore the highest levels of the CNMI government approved it. (*Id.* at 9.) Defendants also rely on the Letter from CNMI's Secretary of Finance to CNMI's Acting Director in the Division of Procurement Services for the CNMI's rationale and policy determinations. (*Id.*)

The Supreme Court has held that "*Parker* immunity is available only when the challenged activity is undertaken pursuant to a clearly articulated policy of the State itself, such as a policy approved by a state legislature, or a State Supreme Court. *S. Motor Carriers Rate Conf., Inc.*, 471 U.S. at 63. In *Southern Motor*, the Supreme Court found that a state statute demonstrated the legislature's clear intent that rates would be determined by a regulatory agency rather than the market even though how those rates were set were left to the agency's discretion.

---

[2] As to Star Marianas's specific allegation that Defendants improperly seek dismissal based on "the merits of the contested facts of this case," Star Marianas does not point to any specific facts in contest. (Mem. 2.)

*Id.* The state statute dictated that the agency was to prescribe "just and reasonable" rates for the commodity being regulated. *Id.* The Court reasoned that "[a] private party acting pursuant to an anticompetitive regulatory program need not 'point to a specific, detailed legislative authorization' for its challenged conduct . . . [a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure." *Id.* at 64 (citation omitted).

Prior to *Southern Motor,* the Supreme Court in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), emphasized the importance that the challenged action is an act of the government by the State acting as "sovereign." *See City of Lafayette*, 435 U.S. at 390. The question presented in *Goldfarb* was "whether a minimum-fee schedule for lawyers published by the Fairfax County Bar Association and enforced by the Virginia State Bar, violated the Sherman Act." *Id.* (quoting *Goldfarb*, 421 U.S. at 775). Defendant claimed that the exemption applied because the Virginia State Bar was a state agency by law. *Id.* (citation omitted). In that case, although the Virginia Legislature empowered the Supreme Court of Virginia to regulate the practice of law and assigned the State Bar a role in that regulation as an administrative agency of the Virginia Supreme Court, no Virginia statute referred to lawyer's fees—the subject of regulation—nor did the Supreme Court of Virginia take any action regarding the subject of regulation. Therefore, the Supreme Court held that "it could not be said that the anticompetitive effects of minimum-fee schedules were directed by the State acting as sovereign." *Id.* at 409-10.

In *Chambers of Commerce of the U.S. of America v. City of Seattle*, the Ninth Circuit focused on the first prong of clear articulation and found that the clear articulation prong was not satisfied. 890 F.3d 769, 787 (2018). It concluded that the ordinance relied on to justify price fixing did not plainly show that the legislature contemplated allowing the parties to price fix nor that the anticompetitive result was foreseeable. *Id.* at 783.

> The plain language of the statute centers on the provision of "privately operated for hire transportation services," not the contractual payment arrangements between for-hire drivers and driver coordinators for use of the latter's smartphone apps or ride referral services. . . . Nothing in the statute evinces a clearly articulated state policy to displace competition in the market for ride referral service fees charged by companies . . . .

*Id.* at 784 (citation omitted). Moreover, "[r]egulation of an industry, and even the authorization of discrete forms of anticompetitive conduct pursuant to a regulatory structure, does not establish that the State has affirmatively contemplated other forms of anticompetitive conduct that are only tangentially related." *Id.* at 785 (quoting *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 236 (2013)).

Here, Defendants do not point to any statute enacted by the CNMI legislature that would demonstrate the legislature's clear intent. Rather, Defendants attempt to exchange the requirement of the legislature's clear intent with that of the DOF itself. The CNMI DOF is authorized to adopt rules and regulations regarding those matters within its jurisdiction. *See* 1 CMC § 2557. Included in these regulations are those which the DOF relies on in its Letter to justify its Contract with MSA— NMIAC §§ 70-30.3-215, 70-30.3-225. Defendants also rely on these regulations as the state's clearly articulated policy. These regulations, however, are not a clearly articulated policy of the CNMI as to any particular activity in the airline industry, approved by the CNMI legislature or the CNMI Supreme Court. Rather, these regulations are adopted by the DOF for procurement procedures. At the hearing, Defendants further asserted 1 CMC § 2553(j) is the clearly articulated policy for the DOF's procurement and Contract in this case. 1 CMC § 2553(j) states: "The duties and responsibilities of the Department of Finance include, but are not limited to, the following: To be in control of and be responsible for procurement and supply in the Commonwealth . . . ." This is not a specific, clearly articulated policy adequate to allow conduct to restrain trade or commerce or create a monopoly in the

airline industry permitted under the Sherman Act because it only grants broad authority to the DOF for procurement.

Although CNMI agencies are permitted to adopt regulations under the Administrative Procedure Act ("APA"), the plain language of the APA, which grants agencies the authority to make these regulations does not plainly articulate state policy to displace competition in the airline industries here in the CNMI nor is the displacement of competition reasonably foreseeable.

Defendants' cited cases are distinguishable from the facts in this case. In the currency exchange concession case with the Department of Transportation ("DOT"), *Deak-Perera Hawaii, Inc. v. Department of Transportation*, the Court found that the DOT was fulfilling its constitutional duty to execute a statute, which permitted the DOT to establish and operate airports. 745 F.2d 1281, 1282-83 (9th Cir. 1984). Defendants only pointed to 1 CMC § 2553(j) as the statutory authority that the DOF was able to enter into the Contract, which, again, only grants broad procurement power unlike the statute in *Deak-Perera* that allowed for the specific regulation of airports.

In another case cited by Defendants, *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, the executive branch was operating within its constitutional and statutory authority. 810 F.2d 869, 875 (9th Cir. 1987). In the exclusive right taxi service case, the executive branch agency acted within its statutory authority when it entered a contract. *Id.* at 875. Here, however, Defendants only point to statutory authority for DOF's procurement and supply in the Commonwealth and not to any statutory authority that would support a similar finding for the activities in the Contract that Defendants entered into. The other out of circuit cases Defendants rely on are also distinguishable. *Coral Aviation Grp. v. Muller*, 2024 WL 3889628, CIVIL ACTION No. 23-1838, at *4 (E.D. Pa. Aug. 21, 2024) (applying the standard under *Town of*

*Hallie v. City of Eau Claire*, 471 U.S. 34 (1985) and not *Midcal*). Because Defendants have failed to establish the first prong of *Parker* Immunity at this stage of the proceedings, their motion fails on this ground.

    **ii.**  **Second Prong of *Parker* Immunity: Actively Supervised by the State Itself**

  Star Marianas argues that there was no active state supervision—in particular stating that there is no indication anywhere in the Complaint or attached documents that the CNMI had the intent, ability, wherewithal, power, or authority to oversee Defendants' anti-competitive acts. (Opp'n 5.) Defendants reply arguing that as a party to the Contract, the CNMI government possessed the power to oversee and enforce the terms of the Contract and in fact, MSA would not be paid if it did not fulfill the terms of the Contract. (Reply 8-9.)

  The Supreme Court has stated that when reviewing whether there is active supervision, the inquiry is flexible and context dependent. *North Carolina State Bd. Dental Exam'r v. FTC*, 574 U.S. 494, 497 (2015). The focus is whether the State's review mechanisms provide "realistic assurances" that a non-sovereign actor's anticompetitive conduct "promotes state policy, rather than merely the party's individual interests." *Id.* (citation omitted). The Court has only identified a few constant requirements of active supervision:

> The supervisor must review the substance of the anticompetitive decision, the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the "mere potential for state supervision is not an adequate substitute for a decision by the State."

*Id.* (internal citations omitted). Last, the State itself must not be an active market participant.

  Here, the Court finds that the Airline Incentive Framework outlines procedural ways in which the CNMI can supervise or verify compliance with the Contract and thus fulfills the second prong of *Parker* Immunity. (Airline Incentive Framework 3-4.) Therefore, this prong of the *Parker* immunity is satisfied.

### B. CNMI as an Indispensable and Necessary Party

Defendants also argue that the Court must dismiss the Complaint because the CNMI is a necessary and indispensable party to this case. (Mem. 13.) Further, the Court cannot accord complete relief in regard to the Contract to which it is a party and which Star Marianas seeks to have declared illegal and enjoined from further enforcement. (*Id.*)

Star Marianas argues that Defendants cannot show that the CNMI is an indispensable party. (Opp'n 6.) It asserts that it has not sought relief in relation to any contract and does not seek to have any contract declared illegal or enjoined from enforcement but rather only the establishment of future similar contracts as to Defendants. (*Id.* at 6-7.) Star Marianas's Complaint seeks to have Defendants *permanently enjoined* and restrained from establishing similar agreements which would be with the CNMI. (Compl. Prayer for Relief ¶ 1.)

Rule 19 dictates "[a] person . . . whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . in the person's absence complete relief cannot be accorded among those already parties." Because Star Marianas's Complaint seeks to enjoin the CNMI government from entering subsequent contracts with the named Defendants, the Court cannot afford Star Marians the complete relief it requests. As such, and because Star Marianas does not argue joinder is infeasible, the Court grants Defendants' Motion pursuant to Rule 19(a)(1)(A).

### IV. CONCLUSION

As detailed herein, the Court finds that Defendants are not entitled to *Parker* immunity because they fail to meet the first prong of the two-part test. However, the Court does find that because the CNMI is not a party to this action, it cannot afford complete relief to Star Marianas who seeks to enjoin the Defendants from entering into future contracts with the CNMI

government that are similar to the agreement at issue in this case. Therefore, Defendants' Motion to Dismiss is granted in part with leave for Star Marianas to file an amended complaint.

IT SO ORDERED this 27th day of February 2025.

_____
RAMONA V. MANGLONA
Chief Judge