F I L E D
Clerk
District Court

MAR 09 2026

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| STAR MARIANAS AIR, INC., | Case No. 1:24-cv-00010 |
| Plaintiff, | |
| v. | **DECISION AND ORDER GRANTING DEFENDANT SOUTHERN AIRWAYS EXPRESS, LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| SOUTHERN AIRWAYS EXPRESS, LLC, *et al.* | |
| Defendants. | |

Before the Court is Defendant Southern Airways Express, LLC's Motion for Judgment on the Pleadings (ECF No. 80), joined by Defendants Marianas Pacific Express, LLC, and Keith Stewart (ECF No. 83). Therein, Defendants move for judgment on the entirety of Plaintiff Star Marianas Air, Inc.'s First Amended Complaint. The Court held a hearing on the Motion on February 12, 2026. For the reasons set forth below, the Court GRANTS the Motion for Judgment on the Pleadings and dismisses the First Amended Complaint in its entirety with leave to amend.

## I.        BACKGROUND

On June 25, 2024, Plaintiff Star Marianas Air, Inc. ("Star Marianas") filed a six-count Complaint against Defendant Southern Airways Express, LLC ("Southern Airways"), Marianas Pacific Express, LLC d/b/a Marianas Southern Airways ("Marianas Southern"), and Marianas Southern President Keith Stewart. Therein, Plaintiff alleged that Defendants engaged in anticompetitive conduct violative of the Sherman Antitrust Act through Defendants' activities arising from the execution of a sole source contract by Marianas Southern with the Commonwealth

of the Northern Mariana Islands ("the Commonwealth" or "CNMI") to provide commercial

passenger flights between Saipan, Tinian, and Rota.  (*See generally* Compl., ECF No. 1.)  After

Defendants obtained a partial dismissal of the Complaint (*see* Mins., ECF No. 33; Mem. Decision

Den. in Part, & Granting in Part S. Airways Express, LLC's Mot. to Dismiss, ECF No. 53), on

December 5, 2024, Plaintiff filed a First Amended Complaint ("FAC") (ECF No. 34), again

alleging that Defendants violated the Sherman Antitrust Act across six counts:[1]

- Counts I and II alleges that Defendant Southern Airways had violated sections 1 and 2 of the Sherman Antitrust Act, respectively (FAC ¶¶ 44-52, 53-62);

- Counts III and IV alleges that Defendant Marianas Southern had violated sections 1 and 2 of the Sherman Antitrust Act, respectively (*id.* ¶¶ 63-81, 82-101); and

- Counts V and VI alleges that Defendant Stewart had violated sections 1 and 2 of the Sherman Antitrust Act, respectively (*id.* ¶¶ 102-121, 122-141).

Plaintiff seeks actual and treble damages, prejudgment interest, and reasonable costs and fees

against all Defendants jointly and severally.  (*Id.* at 25-26 (prayer for relief).)

Defendants sought to dismiss Plaintiff's First Amended Complaint for failure to join the

Commonwealth as a necessary and indispensable party, to no avail.  (Mins., ECF No. 48; Mem.

Decision Den. S. Airways Express, LLC's Mot. to Dismiss 1st Am. Compl. Pursuant to FRCP

12(b)(7), 19, ECF No. 55.)  As such, on February 27, 2025, Defendant Southern Airways filed its

Answer and Affirmative Defenses (ECF No. 51); Defendants Marianas Southern and Stewart filed

a joint Answer (ECF No. 56) a week later.

---

[1] The Court previously recounted the factual allegations set forth in the First Amended Complaint in its Memorandum Decision Denying Defendant Southern Airways Express, LLC's Motion to Dismiss First Amended Complaint Pursuant to FRCP 12(b)(7), 19.  (*See* Mem. Decision Den. Def. S. Airways Express, LLC's Mot. to Dismiss 1st Am. Compl. Pursuant to FRCP 12(b)(7), 19, at 2-5, ECF No. 55.)

1    Thereafter, Defendant Southern Airways filed a Motion for Judgment on the Pleadings

2  (ECF No. 80), which was joined by Defendants Marianas Pacific and Stewart (ECF No. 83).

3  Plaintiff filed its Response in Opposition (ECF No. 84). Defendant Southern Airways filed a Reply

4  (ECF No. 85), which Defendants Marianas Southern and Stewart joined (ECF No. 86).

5  Subsequently, the Court held a hearing on the Motion on February 12, 2026, at which counsel for

6  all Parties appeared and presented oral arguments; the Court then took the Motion under

7  advisement. (Mins., ECF No. 93.)

8                              **II.    LEGAL STANDARD**

9    "After the pleadings are closed—but early enough not to delay trial—a party may move

10  for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings

11  pursuant to Rule 12(c) is "functionally identical" to a motion to dismiss for failure to state a claim

12  pursuant to Rule 12(b)(6), with the "principal difference" between the motions being "the time of

13  filing." *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). As such, as with a

14  Rule 12(b)(6) motion, a Rule 12(c) motion may be based on "the lack of a cognizable legal theory

15  or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica*

16  *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a Rule 12(c) motion, as with a

17  Rule 12(b)(6) motion, *see Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012), "a

18  complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

19  plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

20  *Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face where the complaint's factual

21  content "allows the court to draw the reasonable inference that the defendant is liable for the

22  misconduct alleged." *Id.* (rejecting "'labels and conclusions,'" "'formulaic recitation of the

23  elements of a cause of action,'" "'naked assertions' devoid of 'further factual enhancement,'" and

24

"unadorned, the-defendant-unlawfully-harmed-me accusation[s]" as insufficient to state a facially plausible claim (quoting *Twombly*, 550 U.S. at 555, 557)).  A complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (explaining that plausibility pleading requirement ensures that claims are such that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation"); *Twombly*, 550 U.S. at 558-60 (justifying plausibility pleading standard in need to curb discovery abuse in private antitrust litigation).

"For purposes of the [Rule 12(c)] motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false.  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).  The Court must construe factual allegations in the complaint "in the light most favorable to the non-moving party," *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009), but "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit[2] . . . [or] are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Fleming*, 581 F.3d at 925.

---

[2] "Judgment on the pleadings is limited to material included in the pleadings."  *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 925 n.6 (9th Cir. 2011); Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  The Court "may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion . . . into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

4

### III.    ANALYSIS[3]

**A.  The Parties' Arguments**

Defendants contend that judgment on the entirety of Plaintiff's First Amended Complaint is appropriate because Plaintiff fails to state a claim against any Defendant.  First, Defendants contend that monopolization and attempted monopolization claims under the Sherman Antitrust Act require a showing of exclusionary conduct by the alleged monopolist, but that Plaintiff's allegations fail to suggest that Defendants engaged in any such conduct.  (S. Airways Express's Mot. for J. on Pleadings 10-14 (contending allegations do not show "predation" because Defendants did not set prices below cost, contract subsidizing Defendants was of limited duration, and Plaintiff monopolized the market prior to Defendants' entry) [hereinafter "Defs.' Mot."], ECF No. 80.)  Second, Defendants contend that Plaintiff's allegations fail to show that Defendants were able to "recoup" their losses to the detriment of consumers, another required element of monopolization and attempted monopolization claims.  (*Id.* at 14-17.)  Third, Defendants contend that Plaintiff relies upon the wrong provisions of the Sherman Antitrust Act (*id.* at 17 (contending that 15 U.S.C. §§ 1-2 do not apply to activities in the Commonwealth)) and, in any event, that Plaintiff's allegations fail to show that Defendants engaged in "interstate" commerce as required for applicability of any relevant provision of the Sherman Antitrust Act (*id.* at 17-19 (noting that Plaintiff only alleges that Defendants "substantially affected interisland travel **in the CNMI**" and contending that 15 U.S.C. § 3, as applied to the Commonwealth, still requires interstate commerce for liability thereunder (quoting FAC ¶¶ 51, 61))).

In opposition, Plaintiff first contends that its factual allegations "plausibly support an inference of anticompetitive conduct," namely, that Defendants entered the Commonwealth's

---

[3] In citing the Parties' filings, the Court uses the pagination in the header generated by CM/ECF across all documents.

1    interisland commercial passenger air travel market with the assistance of funds from the sole-

2    source contract with the Commonwealth, set prices below "economically sustainable levels  for

3    the purpose of eliminating" Plaintiff, and that such conduct "tend[ed] to impair the opportunities

4    of rivals" without "further[ing] competition on the merits[.]"  (Pl. Star Marianas Air, Inc.'s Resp.

5    in Opp'n to Def. S. Airways Express, LLC's Mot. for J. on Pleadings 7 [hereinafter "Pl.'s Opp'n"],

6    ECF No. 84; *see also id.* at 8-10 (contending that allegations concerning the characteristics of the

7    market and Defendants' ability to charge below-market prices support inference that Defendants

8    engaged in unlawful exclusionary conduct); *id.* at 13-14 (asserting that contract with the

9    Commonwealth does not immunize Defendants); *id.* at 16-18 (asserting that allegations plausibly

10   show an unlawful conspiracy among Defendants).)  Plaintiff next contends that Defendants'

11   arguments erroneously seek Plaintiff to prove its claims at the pleading stage, as opposed to merely

12   setting forth factual allegations giving rise to a plausible claim for relief.  (*Id.* at 9-12 (identifying

13   "[w]hether [Southern Airways's] pricing was below an appropriate measure of cost," "whether it

14   was sustained through subsidy rather than efficiency," and issues concerning recoupment as factual

15   issues that cannot be resolved at the pleading stage); *see also id.* at 18-20 (contending that

16   Defendants' arguments improperly seek the Court to accept Defendants' version of facts, draw

17   inferences against Plaintiff, and rely upon materials outside of the pleadings).)  Plaintiff then

18   contends that its allegations plausibly establish that Defendants engaged in "interstate" commerce

19   as required for liability under the Sherman Antitrust Act.  (*Id.* at 14-16 (asserting that prior

20   decisions and federal regulations deem air transportation activities as inherently "interstate" and,

21   in any event, "practical and economic realities" indicate that the market is not "purely local"); *id.*

22   at 20-21 (asserting that 15 U.S.C. § 3's "prohibitions . . . are virtually identical to the prohibitions"

23

24

1    in 15 U.S.C. §§ 1 and 2).)  Plaintiff further requests that, should the Court find that judgment is

2    warranted, that Plaintiff be afforded leave to amend.  (*Id.* at 12-13, 20-21.)

3          In reply, Defendants first highlight that Plaintiff fails to address their arguments concerning

4    the short duration of the contract.  (S. Airways Express's Reply in Supp. of Mot. for J. on Pleadings

5    2-3 [hereinafter "Defs.' Reply"], ECF No. 85.)  Defendants then reiterate their arguments asserting

6    that Plaintiff's allegations fail to show predation or recoupment (*id.* at 3-8), are brought under the

7    wrong provisions of the Sherman Antitrust Act (*id.* at 8), and fail to establish that Defendants'

8    activities had a substantial effect on "interstate" commerce (*id.* at 8-9).

9    **B.  Discussion**

10         The Court first addresses Defendants' arguments challenging the applicability of the

11   Sherman Antitrust Act due to their jurisdictional nature.[4]  The Court then turns to Defendants'

12   remaining arguments concerning the substantive elements of Plaintiff's claims under sections 1

13   through 3 of the Sherman Antitrust Act.  The Court concludes that Defendants' Motion is well

14   taken.

---

17   [4] Though Defendants recognize in their Motion that their "interstate commerce" challenge is jurisdictional
18   (*see* Defs.' Mot. 13), Defendants do not cite any rule apart from Rule 12(c) in moving for disposition of
     Plaintiff's First Amended Complaint.  Courts have addressed motions asserting a jurisdictional challenge
     to the applicability of the Sherman Antitrust Act under Rules 12(b)(1), (b)(6), and 56.  *Thornhill Publ'g*
19   *Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 732-33 (9th Cir. 1979).

20         Here, as Defendants' challenge rests on the substance and sufficiency of Plaintiff's allegations in
     disputing jurisdiction, Defendants' challenge at this juncture is appropriately treated as a facial attack on
21   the Court's subject-matter jurisdiction under Rule 12(b)(1).  *Id.* at 733; *Leite v. Crane Co.*, 749 F.3d 1117,
     1121 (9th Cir. 2014) ("A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they
22   'are insufficient on their face to invoke federal jurisdiction.'  The district court resolves a facial attack as it
     would a motion to dismiss under Rule 12(b)(6):  Accepting the plaintiff's allegations as true and drawing
     all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient
23   as a legal matter to invoke the court's jurisdiction."  (citations omitted) (quoting *Safe Air for Everyone v.*
     *Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004))).  Therefore, engaging in further factual analysis or converting
24   Defendants' challenge to a Rule 56 motion at this juncture is unnecessary.

**1. Jurisdiction**

    **a. "Interstate commerce" or "commerce with a foreign nation" is required to establish subject-matter jurisdiction under sections 1 and 2 of the Sherman Antitrust Act, while jurisdiction under section 3 over conduct arising in the Commonwealth requires such conduct to be part of commerce with the District of Columbia or a territory other than the Commonwealth.**

In enacting the Sherman Antitrust Act, ch. 647, §§ 1 *et seq.*, 26 Stat. 209 (1890) (current version at 15 U.S.C. §§ 1 *et seq.*), "Congress meant to deal comprehensively and effectively with the evils resulting from contracts, combinations, and conspiracies in restraint of trade, and to that end to exercise all the power it possessed." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 435 (1932). As relevant here, the first three sections of the Sherman Antitrust Act set forth textually identical prohibitions against anticompetitive conduct, differing only in the location of, or the jurisdictional entities engaged in, trade and commerce.[5] *Compare* 15 U.S.C. § 3(a) (prohibiting "[e]very contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce"), *with id.* § 1 (identical prohibitory text); *compare id.*, § 3(b) (making it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce"), *with id.* § 2 (identical prohibitory text). Sections 1 and 2, codified at 15 U.S.C. §§ 1 and 2, respectively, prohibit anticompetitive conduct involving "trade or commerce *among the several States*, or with foreign nations[.]" 15 U.S.C. §§ 1, 2 (emphasis added). In contrast, section 3 applies to "trade or commerce *in any Territory of the United States*[,]" "between any such Territory and another," or "between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations[.]" *Id.* § 3(a), (b) (emphasis added). The difference in language concerning location or jurisdictional

---

[5] Though sections 1 to 3 of the Sherman Antitrust Act only provide for a criminal penalty (and thus vest enforcement authority solely in the United States, *see* 15 U.S.C. § 4), section 4 of the Clayton Act, ch. 323, § 4, 38 Stat. 731 (1914) (current version at 15 U.S.C. § 15), authorizes private parties who are injured "by reason of anything forbidden in the antitrust laws" to "sue therefor[.]" 15 U.S.C. § 15(a).

1    entity reflects two distinct sources of authority for Congress to regulate anticompetitive conduct,

2    with corresponding ramifications for subject-matter jurisdiction.

3         On one hand, in enacting sections 1 and 2, Congress relied upon its "broad authority . . .

4    under the Commerce Clause" to regulate not only "activities *in* interstate commerce" but also

5    "other activities, while wholly local in nature, [that] nevertheless substantially *affect* interstate

6    commerce." *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980) ("This Court

7    has often noted the correspondingly broad reach of the Sherman Act.").  Thus, sections 1 and 2

8    contain a "jurisdictional requirement" that the activities complained of must either be "in

9    commerce" or have an "effect on commerce."  *Id.* at 242; *Thornhill Publ'g Co., Inc. v. Gen. Tel.

10   & Elecs. Corp.*, 594 F.2d 730, 737 (9th Cir. 1979) (quoting *Las Vegas Merch. Plumbers Ass'n v.*

11   *United States*, 210 F.2d 732, 739 n.3 (9th Cir. 1954), in explaining the two bases for jurisdiction

12   under the Sherman Antitrust Act:  "[t]hat the acts complained of, occurred within the flow of

13   interstate commerce" or "occurred wholly on the state or local level, in intrastate commerce, but

14   substantially [a]ffected interstate commerce"); *see also Atl. Cleaners*, 286 U.S. at 434 (observing

15   that section 1, "having been passed under the specific power to regulate commerce," is "necessarily

16   . . . limited by the scope of that power").

17        On the other hand, Congress's enactment of section 3 relied upon its "general power" to

18   legislate for "all territories to which its powers might extend," *Puerto Rico v. Shell Co.*, 302 U.S.

19   253, 259 (1937), regardless of incorporated or unincorporated status, *United States v. Standard Oil*

20   *Co. of Cal.*, 404 U.S. 558, 560 (1972); *see also Norman's on the Waterfront, Inc. v. Wheatley*, 444

21   F.2d 1011, 1016-19 (3rd Cir. 1971).  As such, section 3 extends to trade and commerce carried out

22   in the territories without the requirement that the activities at issue must be in, or have a substantial

23   effect on, interstate commerce.  *See, e.g.*, *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299

24

1    (9th Cir. 1986) (reversing summary judgment on Guam souvenir shop owners' complaint alleging

2    tour operators and competing souvenir vendors directed tourists visiting Guam to the vendors, and

3    away from plaintiffs' shop, in exchange for payments that the vendors paid but plaintiffs refused

4    to pay); *Standard Oil Co.*, 404 U.S. at 558 (reversing dismissal of complaint for conspiracy to

5    monopolize distribution and sale of petroleum products in American Samoa); *Wheatley*, 444 F.2d

6    at 1016-19 (invalidating alcohol fair-trade scheme enacted by Virgin Islands Legislature); *Tribolet*

7    *v. United States*, 95 P. 85, 88 (Ariz. 1908) (affirming conviction for conspiracy and attempted

8    monopolization of slaughter and sale of meant in single municipality within then-territory of

9    Arizona).

10       Defendants assert, however, that even if Plaintiff's claims were construed as section 3

11   claims,[6] section 3, as applied to the Commonwealth through the Covenant to Establish a

12   Commonwealth of the Northern Mariana Islands in Political Union with the United States of

13   America ("the Covenant"), Pub. L. 94-241, 90 Stat. 263 (1976) (reproduced at 48 U.S.C. § 1801

14   note), still maintains the requirement that the conduct complained of must occur in, or substantially

15   affect, interstate commerce.  The Court concludes that Defendants are partially correct.

16

17

18

_____

19   [6] Although plaintiffs are well-advised to research and identify the correct legal authority underlying a cause
20   of action, *see McHenry v. Renne*, 84 F.3d 1172, 1179-80 (9th Cir. 1996) (detailing "unfair burdens on
     litigants and judges" where complaint is "confusing," including risk of surprise to defendants, "wast[ing]"
     the time of judges in determining "what claims are made against whom," and impact on rights of litigants
21   in other cases), "[a] complaint should not be dismissed if it states a claim under any legal theory, even if
     the plaintiff erroneously relies on a different legal theory," *Haddock v. Bd. of Dental Examiners*, 777 F.2d
22   462, 464 (9th Cir. 1985); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").
     The Court further notes that dismissal based on Plaintiff's citing sections 1 and 2, instead of section 3,
     would be particularly inappropriate here as the conduct prohibited by sections 1 and 2 would also be
23   prohibited by section 3, the provisions are all immediately adjacent to each other within the Sherman
     Antitrust Act and its codified reproduction in the U.S. Code, and Defendants are plainly on notice of the
24   factual and legal bases for Plaintiff's claims.

The Commonwealth is unique among the territories because the relationship between the United States and the Commonwealth was created in 1976 through the ratification, by both the United States and the Commonwealth, of a legal document—the Covenant—that

> acknowledges Congressional power over territories as provided in the Constitution's territorial clause which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." However, although the territorial clause provides the Constitutional basis for Congress's legislative authority in the Commonwealth, *it is by the Covenant that we measure the limits of that power*.

*Saipan Stevedore Co. Inc. v. Dir., Off. of Workers' Comp. Programs*, 133 F.3d 717, 721 (9th Cir. 1998) (emphasis added) (quoting U.S. Const. art. IV, § 3, cl. 2); *see also United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754-55 (9th Cir. 1993) (explaining that the Covenant limits Congress's authority to pass legislation with respect to the Commonwealth such that "the United States must have an identifiable federal interest that will be served by the relevant legislation," and such federal interest must be balanced "against the degree of intrusion into the internal affairs of the CNMI" in view of the Covenant's provisions guaranteeing the right of self-government and requiring mutual consent of the United States and the Commonwealth to modify any fundamental provisions of the Covenant). In other words, the Covenant constitutes a prospective and retrospective *statutory* limit Congress imposed on its exercise of its *constitutional* "general power" under the Territorial Clause, *Puerto Rico*, 302 U.S. at 259, to legislate with respect to the Commonwealth. Consequently, whether Congress elected to "exercise all the power it possessed," *Atl. Cleaners*, 286 U.S. at 435, in extending the Sherman Antitrust Act to encompass the Commonwealth turns on the Covenant's "certain provisions" providing that "the United States Constitution and certain United States statutes will apply to the CNMI. For those laws not

explicitly addressed, the Covenant provides formulae for determining whether a federal law will apply to the CNMI." *Salas v. United States*, 116 F.4th 830, 836 (9th Cir. 2024).

Sections 501 and 502 of the Covenant enumerate specific laws of the United States that are applicable to the Commonwealth. The Sherman Antitrust Act is not among those enumerated laws. *See* Covenant §§ 501, 502(a)(1), 90 Stat. at 267-68. As such, section 502(a) provides the "formula[] for determining whether a federal law will apply," *Salas*, 116 F.4th at 836, as follows:

> (a) *The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands*, except as otherwise provided in this Covenant:
>
> > (1) those laws which provide federal services and financial assistance programs and the federal banking laws as they apply to Guam; Section 228 of Title II and Title XVI of the Social Security Act as it applies to the several States; the Public Health Service Act as it applies to the Virgin Islands; and the Micronesian Claims Act as it applies to the Trust Territory of the Pacific Islands;
> >
> > (2) *those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States*; and
> >
> > (3) those laws not described in paragraph (1) or (2) which are applicable to the Trust Territory of the Pacific Islands, but not their subsequent amendments unless specifically made applicable to the Northern Mariana Islands, as they apply to the Trust Territory of the Pacific Islands until termination of the Trusteeship Agreement, and will thereafter be inapplicable.

Covenant § 502(a), 90 Stat. at 268 (emphasis added). "Thus, previously enacted laws which are of general application to the States and which apply to Guam, apply to the Northern Mariana Islands." *Saipan Stevedore Co.*, 133 F.3d at 721.

The Sherman Antitrust Act plainly satisfies both conditions for applicability to the Commonwealth. First, the Sherman Antitrust Act is applicable to Guam by virtue of the expansive definition of "commerce" as used therein. *See* 15 U.S.C. § 12(a) (defining "commerce" to include

1  "trade or commerce among the several States and with foreign nations," "between . . . any Territory

2  of the United States and any State, Territory, or foreign nation," "between any insular possessions

3  or other places under the jurisdiction of the United States," "between any such possession or place

4  and any . . . Territory of the United States," and "within . . . any Territory or insular possession or

5  other place under the jurisdiction of the United States" but explicitly only excluding the

6  Philippines); *see also Salas*, 116 F.4th at 840 ("[A] statute that references the United States and its

7  territories and possessions is a strong indication that it is meant to apply in the CNMI.").  In

8  addition, as "[t]he Covenant's framers considered the term 'applicable to Guam' to mean not only

9  'applicable with respect to' Guam, but also to mean 'applicable within' Guam," *Northern Mariana*

10  *Islands v. United States*, 279 F.3d 1070, 1073 (9th Cir. 2002), the Sherman Antitrust Act's lack of

11  an exemption for Guam is sufficient:  a federal law need not "have a practical effect in Guam for

12  the law to apply," *Salas*, 116 F.4th at 841; *Northern Mariana Islands*, 279 F.3d at 1073 ("That is,

13  the amendments, regardless of their treatment of Guam, are law within Guam.  Thus, these

14  amendments *are* 'applicable to Guam' . . . .").

15      Second, the Ninth Circuit has explained that the phrases "applicable to" and "application

16  to" in section 502(a)(2) of the Covenant are to be construed identically:  "Because application to

17  Guam is understood to mean 'applicable with respect to' and 'applicable within' Guam, it follows

18  that 'application to the several States' likewise means 'applicable with respect to' and 'applicable

19  within' the several States."  *Salas*, 116 F.4th at 841 (citing *Northern Mariana Islands*, 279 F.3d at

20  1073).  As the Sherman Antitrust Act does not exclude or exempt any States from its provisions,

21  the Sherman Antitrust Act is generally applicable to the States.

22      Thus, with both conditions set forth in section 502(a)(2) of the Covenant satisfied, that

23  same section provides how the Commonwealth is to be treated under the Sherman Antitrust Act:

24

the Sherman Antitrust Act "will apply to the Northern Mariana Islands" as it is "applicable to the several States." Covenant § 502(a)(2), 90 Stat. at 268. Such language "requires [the Court] to treat the CNMI as if it were a State for the purposes of the [Sherman Antitrust Act.]" *Northern Mariana Islands*, 279 F.3d at 1072; *see, e.g.*, *DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992) (holding that section 502(a)(2) of the Covenant rendered the Commonwealth as not a "person" within the meaning of 42 U.S.C. § 1983 in light of Supreme Court decisions holding that Guam and the States are not "persons" within the meaning of 42 U.S.C. § 1983). Conduct arising in a State is not subject to the Sherman Antitrust Act unless it touches upon interstate commerce or commerce with a foreign nation, 15 U.S.C. §§ 1, 2; *McLain*, 444 U.S. at 242, or if it involves trade and commerce with a territory or the District of Columbia, 15 U.S.C. § 3(a), (b). Accordingly, conduct arising in the Commonwealth is not subject to sections 1 and 2 of the Sherman Antitrust Act unless it touches upon interstate commerce or commerce with a foreign nation,[7] and not subject to section 3 of the Sherman Antitrust Act unless it involves trade and commerce with the District of Columbia or a territory other than the Commonwealth.[8]

---

[7] To be clear, allegations premised on commerce between the Commonwealth and another territory or the District of Columbia without accompanying allegations describing the impact on commerce with another State or foreign nation would be insufficient to establish jurisdiction under sections 1 and 2. Such interterritorial commerce would still be "commerce" between two entities that are not States for *constitutional* purposes—and thus not within Congress's authority under the Commerce Clause.

The Court need not pass on whether the Covenant acts as a later-in-time legislative act that amended sections 1 and 2 to be premised also on Congress's authority under the Territorial Clause because the plain text of sections 1 and 2, combined with the provisions of the Covenant, would still require a showing of interstate commerce to establish jurisdiction under those sections over conduct arising within the Commonwealth.

[8] The Court's conclusion here is confirmed by materials produced by the Marianas Political Status Commission, the Northern Mariana Islands Commission on Federal Laws, and the Department of the Interior's Office of the Solicitor, three entities tasked with reviewing the applicability of federal law to the Commonwealth in differing contexts.

The Marianas Political Status Commission (MPSC) was the body representing the people of the Northern Marianas in negotiations with the United States concerning the documents that would create the

current political and legal relationship between the United States and what would become the Commonwealth. The MPSC produced a "contemporaneous analysis of the Covenant," *De Leon Guerrero*, 4 F.3d at 754, that is "authoritative" in "assist[ing the Court] in discerning the meaning of the Covenant[,]" *Northern Mariana Islands*, 399 F.3d at 1065. As to section 502(a)(2) of the Covenant, the MPSC explained:

> Subsection (a)(2) is the general formula for the application of federal laws. It contains a two-prong test: applicability to Guam and applicability generally to the states. This test is employed for two reasons. . . . Second, it is intended to prevent the application of laws so as to reach intraterritorial matters within the Northern Mariana Islands where similar intrastate matters within the states are not reached. To reach such matters in the Northern Marianas would be inconsistent with the guarantee of local self-government contained in the Covenant.

Marianas Pol. Status Comm'n, Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands 53 (1975).

The Covenant provided for the establishment of the Northern Mariana Islands Commission on Federal Laws "to survey the laws of the United States and to make recommendations to the United States Congress" as to whether federal laws not applicable to the Commonwealth should be made applicable and whether federal laws applicable to the Commonwealth should be made inapplicable. Covenant § 504, 90 Stat. at 268; *Salas*, 116 F.4th at 837. In its second interim report, the Commission engaged in a title-by-title survey of the United States Code. *See* N. Mar. I. Comm'n on Fed. L., Welcoming America's Newest Commonwealth: The Second Interim Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States 21-22 (1985) (explaining methodology) [hereinafter "2d Interim Report"]. As to the Sherman Antitrust Act, the Commission observed:

> Present applicability.
>
> The Sherman Antitrust Act and the Clayton Act apply to the Territories and insular possessions as well as the States. . . .
>
> Guam is an insular possession of the United States and well within the ambit of congressional power. The antitrust laws are consequently applicable to Guam. By operation of section 502(a)(2) of the Covenant, those laws also apply to the Northern Mariana Islands.
>
> [. . .]
>
> Discussion.
>
> The residents of the Northern Mariana Islands, few in number and distant from alternative suppliers, are particularly vulnerable to anticompetitive practices. The federal antitrust laws should continue to apply to the Northern Mariana Islands for the protection of those residents.
>
> If the antitrust laws were made inapplicable to the Northern Mariana Islands, the Northern Mariana Islands could become a haven for arrangements that would have adverse effects not only on competition and

1  //

2  //

3  //

4  //

_____

consumers in the Northern Mariana Islands but also on competition and consumers in the United States. . . .

2d Interim Report at 314.

The Department of the Interior generally supervises the relations between the Commonwealth and the United States. Exec. Order No. 12,572, 51 Fed. Reg. 40,401 (Nov. 3, 1986). In 1993, its Office of the Solicitor published a three-volume work titled *The Application of Federal Laws in: American Samoa, Guam, The Northern Mariana Islands, The U.S. Virgin Islands*, also surveying the U.S. Code title-by-title as it applied to the four territories. *See* Ruth G. Van Cleve, Dep't of Interior Off. of Solicitor, The Application of Federal Laws in: American Samoa, Guam, The Northern Mariana Islands, The U.S. Virgin Islands xxv-xxx (1993) [hereinafter "Van Cleve"]. As to the Sherman Antitrust Act, the Office observed:

Few legal conclusions in this study are more certain that that the principal Federal laws pertaining to Monopolies and Combinations in Restraint of Trade (15 U.S.C. 1-36)—namely, the Sherman Act enacted in 1890 (15 U.S.C. 17 [sic]), and the Clayton Act, in 1914 (15 U.S.C. 12-27)—apply to the territories of the Virgin Islands, Guam, Samoa, and the Northern Marianas[.]

The Sherman Act has contained from the outset a provision concerning its application to the "Territories" of the United States (15 U.S.C. 3), making clear that its constraints apply within each "Territory", as well as to commerce between the Territories, a Territory and a State, and a Territory and a foreign country. . . .

The Puerto Rico and Samoa cases [*Puerto Rico v. Shell Co.*, 302 U.S. 253 (1937); *United States v. Standard Oil Co. of Cal.*, 404 U.S. 558 (1972)] make clear that the Sherman Act applies to the Virgin Islands and Guam. . . . By operation of section 502(a)(2) of the Covenant, the Sherman Act also applies to the Northern Marianas, but only to commerce between the Northern Marianas and a place outside of it, owing to the language of the section 502(a)(2) of the Covenant. (As has often been pointed out in this study, section 502(a)(2) operates to extend to the Northern Marianas those laws, enacted before January 9, 1978, that are both applicable to Guam and "of general application to the several States", but such laws then become applicable to the Northern Marianas "as they are applicable to the several States". Because the Congress cannot regulate intra-State commerce, so section 502(a)(2) results in its not regulating intra-Northern Marianas commerce.)

Van Cleve at 276-77 (Memorandum No. 15-1, Sept. 1986).

16

b.  **Plaintiff's allegations plead sufficient factual material to show that Defendants' activities had a substantial effect on "interstate commerce" for jurisdiction under sections 1 and 2 of the Sherman Antitrust Act.**

Defendants' challenges to Plaintiff's reliance on sections 1 and 2 of the Sherman Antitrust Act turn on whether Plaintiff's allegations of Defendants' conduct establishes that Defendants' conduct was "in" interstate commerce or "substantially affect[ed]" interstate commerce. *McLain*, 444 U.S. at 242 (emphasis removed). "In determining jurisdiction under the Sherman Act, the focus of the inquiry is the defendant's business activities." *Musick v. Burke*, 913 F.2d 1390, 1395 (9th Cir. 1990). Plaintiff's First Amended Complaint repeatedly asserts that Defendants' activities "substantially affected interisland travel in the CNMI, directly causing disruption and unreasonable restraint on trade within the flow of commerce." (FAC ¶¶ 51, 61, 80, 99, 119, 139.) Thus, the relevant inquiry is whether Plaintiff's allegations set forth sufficient factual material to establish that Defendants' activities, "local in nature, . . . [have] an effect on some other appreciable activity demonstrably in interstate commerce." *McLain*, 444 U.S. at 242. The Ninth Circuit has explained:

> Whether the defendant's activities sufficiently affect interstate commerce to create Sherman Act jurisdiction is a highly fact-based question calling for common sense judgment. Applying such common sense judgment means that while no specific dollar amount need be alleged and a plaintiff may show aggregated effects on commerce of defendant's activities, the alleged effect still must be considered in proportion to the parties' businesses as a whole.

*Musick*, 913 F.2d at 1395 (internal quotation marks and citations omitted); *see also McLain*, 444 U.S. at 242-43 (plaintiff's burden to demonstrate "substantial effect" does not require the "more particularized showing" of actual effect caused by the alleged anticompetitive conduct because "liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect").

Here, Plaintiff's allegations demonstrate that Defendants' commercial passenger air travel services were intended to, *inter alia*, provide passengers with increased opportunities to fly to

Guam to transit to other destinations, including Honolulu.  (FAC ¶¶ 31-32.)  Furthermore, the language of the contract and accompanying documents indicate that Defendants' services were part of a bid to "maintain or revive tourism and tourism-related activities" after "the COVID-19 pandemic severely curtailed tourism to the CNMI from outside the CNMI . . . ."  (*Id.*, Ex. A, at 3 (contract), ECF No. 34-1; *see also id.*, Ex. E, at 29 (justification letter) (observing that "[t]he CNMI's economy . . . is solely reliant on *international travel and tourism*" and COVID-19 pandemic "halted" the CNMI's economy and "commercial activities on all three islands have been detrimentally impacted" (emphasis added)), ECF No. 34-1.)  Defendants' provision of additional flights to Guam would "allow tourists and potential visitors a secondary accommodation option and additional flight schedules for travel into the island of Saipan transiting from the island of Guam" through same-day connectivity with the once-daily Honolulu-Guam flight operated by a national air carrier.  (FAC, Ex. E, at 32; *id.*, Ex. F, at 36 ("Airline Incentive Framework")) (agreement to provide same-day connectivity with United Airlines's Honolulu-Guam flight in exchange for funding from the Commonwealth), ECF No. 34-1.)  And Defendants' alleged business activities would involve the purchase and relocation of aircraft from the U.S. mainland (*i.e.*, other States) to the Commonwealth alongside the establishment of facilities to host transient personnel drawn from Defendant Southern Airways's activities in other regions of the U.S. mainland.  (FAC, Ex. F, at 40-43 (Defendants' air services proposal in support of funding request).)  As such, Plaintiff has plausibly alleged that Defendants' activities fall within the jurisdiction of sections 1 and 2 of the Sherman Antitrust Act because Defendants' activities have a substantial effect on interstate commerce arising from passenger air traffic—namely, increasing passenger volume and lower consumer costs tied to Guam, Honolulu, and other international routes—and accompanying logistical and support activities, involving resources and personnel from the U.S.

mainland, for Defendants' services.  *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329-30 (1991) ("necessary interstate nexus" existed where limited services were regularly performed for out-of-state persons, generated revenues from out-of-state sources, and were "part of the entire operation" of the enterprise); *Musick*, 913 F.2d at 1398 (jurisdiction exists where plaintiff provides sufficient material to "at least support an inference that some quantifiable effect on commerce of defendant's intended interference with plaintiff's business has occurred"); *McLain*, 444 U.S. at 246 ("not insubstantial effect" on interstate commerce exists where allegations bear on impact to activities that "necessarily affect both the frequency and the terms" of ultimate interstate commercial transactions).

Therefore, the Court finds that Plaintiff's allegations have set forth sufficient factual material, accepted as true, to establish jurisdiction under sections 1 and 2, *i.e.*, that Defendants' conduct falls within Congress's authority to regulate interstate commerce pursuant to the Commerce Clause.

      **c.  In the alternative, Plaintiff's allegations plead sufficient factual material to show that Defendants' activities involve trade or commerce with a territory other than the Commonwealth for jurisdiction under section 3 of the Sherman Antitrust Act.**

In the alternative, jurisdiction over Plaintiff's claims under section 3 of the Sherman Antitrust Act also exists.  As discussed *supra*, Defendants are alleged to have entered into the contract with the Commonwealth to provide additional flights to Guam and subsequently did operate such flights.  Such allegations are sufficient to establish that Defendants' conduct touched upon "trade or commerce . . . between any . . . Territory [*i.e.*, Guam] . . . and any State [*i.e.*, the Commonwealth]."  15 U.S.C. § 3(a), (b).

Therefore, as the Court finds that it has subject-matter jurisdiction over Plaintiff's claims, the Court now turns to the merits of whether Plaintiff states a claim under sections 1, 2, or 3 of the Sherman Antitrust Act.

1    **2.  Merits[9]**

2        "The Sherman Act contains two principal prohibitions."  *Epic Games, Inc. v. Apple, Inc.*,

3    67 F.4th 946, 973 (9th Cir. 2023).  Section 1, "target[ing] *concerted* action," *id.* at 973-74, forbids

4    "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade

5    or commerce among the several States, or with foreign nations," 15 U.S.C. § 1.  Section 2,

6    "target[ing] *independent* action," *Epic Games*, 67 F.4th at 974, makes it unlawful to "monopolize,

7    or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

8    any part of the trade or commerce among the several States, or with foreign nations," 15 U.S.C.

9    § 2.  *See also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-69 (1984) (discussing

10   rationale underlying Congress's intent to distinguish between concerted and independent action).

11   **a.  Section 1 Claims (Counts I, III, V)**

12       To state a claim under section 1, Plaintiff

13           must plead facts which, if true, will prove "(1) a contract,
             combination or conspiracy among two or more persons or distinct
14           business entities; (2) by which the persons or entities intended to
             harm or restrain trade or commerce among the several States, or with
15           foreign nations; (3) which actually injures competition."  In addition
             to these elements, [Plaintiff] must also plead (4) that [it was] harmed
16           by the [Defendants'] anti-competitive conduct, combination, or
             conspiracy, and that this harm flowed from an "anti-competitive
17           aspect of the practice under scrutiny."

18   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (internal citations omitted)

19   (first quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), then quoting *Atl.*

20   *Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).  Although the Parties' arguments

21   do not expressly address the elements of a section 1 claim, as the Parties recognized at oral

22   —————————————————

23   [9] Although the Court's remaining discussion *infra* is framed under sections 1 and 2, as discussed *supra*,
     section 3 proscribes the same conduct as sections 1 and 2.  *See supra* Part III-B-1-a.  As such, failure to
     state a claim under section 1 would also constitute a failure to state a claim under section 3(a), and a failure
24   to state a claim under section 2 would also constitute a failure to state a claim under section 3(b).

argument, Defendants' challenge based on the insufficiency of Plaintiff's allegations as to predation also bears on the second and third elements of a section 1 claim: whether Defendants "intended to harm or restrain trade or commerce" and whether Defendants' alleged anticompetitive agreement "actually injures competition." *Brantley*, 675 F.3d at 1197. (*See* Defs.' Mot. 12-14 (contending that contractual language dispels any suggestion that Defendants and the Commonwealth sought to eliminate competition and citing Plaintiff's existing monopoly status).) Based on the allegations set forth in the First Amended Complaint, the Court finds that only the second element need be addressed, as failure to establish either element is fatal to Plaintiff's section 1 claims.

As to the second element, Plaintiff's allegations fail to provide sufficient factual content to permit the inference that Defendants had the requisite intent to harm or restrain trade or commerce.[10] Plaintiff relies upon the language of the contract and accompanying justification letter in asserting that Defendant Marianas Southern "entered into a predatory pricing scheme with the other Defendants . . . with the goal of running Star Marianas out of its free market business."

---

[10] The Supreme Court has distinguished between conduct that is *per se* violative of the Sherman Antitrust Act and conduct that requires further assessment under a rule of reason, with "no further inquiry into the practice's actual effect on the market or the parties' intentions . . . necessary" if the conduct falls within the former category. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191-92 (9th Cir. 2015). "Classic examples [of *per se* violative conduct] include agreements among competitors to fix prices, divide markets, and refuse to deal." *Id.* at 1191; *see also Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996) (also listing "group boycotts, tying arrangements, and output limitations" among *per se* violations but cautioning that "the per se approach is not to be readily expanded to new arrangements or to business relationships with which the courts are inexperienced").

Here, Plaintiff's allegations based on Defendant Marianas Southern's contract with the Commonwealth does not establish that Defendants' conduct is *per se* violative of the Sherman Antitrust Act because the agreement is not an "agreement[] among competitors" within the Commonwealth's passenger air travel market: the Commonwealth, as the counterparty to the contract fixing ticket prices, was not in the business of providing passenger air travel. Nor does Plaintiff contend that Defendants' conduct was a *per se* violation. Thus, "[t]he parties do not dispute that the rule of reason applies in this case, and the pleading requirements for a rule of reason case therefore apply." *Brantley*, 675 F.3d at 1197. Plaintiff must plead facts bearing on Defendants' intent in executing the contract with the Commonwealth.

(FAC ¶ 17; *see also id.* ¶¶ 22-27, 31-33.)  But a review of the contract and justification letter, as attached to Plaintiff's First Amended Complaint, belies Plaintiff's allegations as mere "'naked assertions' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557), that are insufficient to establish Defendants' intent.

First, the only text within the body of the contract that sets forth the substantive basis for the contract provides:

### IV.   GENERAL PURPOSE

The purpose of this contract is for the Commonwealth to procedure from the Contractor the services described in this contract and in the attached exhibits and to enjoy any warranty or other goods provided for by this contract.  The services being procured are described as follows:

Tourism is a vital part of the economy of the CNMI[;] however, the COVID-19 pandemic severely curtailed tourism to the CNMI from outside the CNMI and also reduced inter-island travel within the CNMI.  The federal government, through the American Rescue Plan Act ("ARPA"), U.S. P.L. 117-2, subtitle M, section 602(c), provided funds to the CNMI whereby the CNMI could, in turn, provide funding to maintain or revive tourism and tourism related activities in the CNMI.

The purpose of this contract is to establish an incentive framework between the Commonwealth and the Contractor whereby the Contractor would be incentivized to provide inter-island passenger and cargo service in the Marianas Islands.  This incentive framework will take the form of an Initial Incentive Fund, a Flight Incentive Program, and Government Related Pricing.

(FAC, Ex. A, at 3.)  The plain text of the contract does not provide any basis for the inference that Defendant Marianas Southern and the Commonwealth intended for the contracted-for services to eliminate Plaintiff to the detriment of consumers.  *See Manglona v. Baza*, 2012 MP 4 ¶ 27 (N. Mar. I. 2012) ("The intent of contracting parties is generally presumed to be encompassed by the plain

1  language of contract terms." (quoting *Riley v. Pub. Sch. Sys.*, 4 N.M.I. 85, 88 (N. Mar. I. 1994)));[11]

2  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781 789 (9th Cir. 1996) (although defendants

3  consolidated payment practices, facially benefitting consumers, defendants were alleged to be

4  ultimately seeking to increase prices, and record suggested that elimination of certain payment

5  practices "does appear likely to increase the prices paid by the end consumer"). Instead, the

6  contract merely indicates that the Commonwealth merely sought Defendant Marianas Southern to

7  enter the market. The only reference to Plaintiff as a trigger for the agreement appears in the

8  recitals at the beginning of the document setting forth the "Airline Incentive Framework":

9          WHEREAS, *the recent temporary closure of the only current*
10     *inter-island air carrier demonstrated the vulnerability of the CNMI*
        *economy*, including its tourist economy, to only having one air
        carrier in the CNMI.

11
          WHEREAS, [Marianas Southern Airways] was formed as a
12     joint venture between MP Enterprises, LLC and Southern Airways
        in order to provide inter-island scheduled and chartered air and cargo
13     passenger service between the islands of the Marianas Islands
        including Saipan, Tinian, Rota, and Guam. However, Marianas
14     Southern needs economic incentives in order to begin operations in
        the CNMI.

15
          WHEREAS, the government of the CNMI has the means and
16     desire to provide incentive funding to Marianas Southern in order to
        promote tourism to and within the CNMI and to provide increased
17     economic security for the people of the CNMI.

18        WHEREAS, as part of this incentive agreement, the CNMI
        government will provide start-up funding and per flight incentive
19     funding for a set period of time to Marianas Southern. In turn,
        Marianas Southern agrees to operate certain flights at set rates as
20     well as provide other consideration.

21  (FAC, Ex F, at 35 (emphasis added).) Such language obliquely identifies Plaintiff as the sole inter-

22  island air carrier but does not indicate that Defendant Marianas Southern and the Commonwealth

23  _____

24  [11] Commonwealth law governs the interpretation of the contract. (*See* 1st Am. Compl., Ex. A, at 10 ("This
     contract shall be interpreted under the laws of the Commonwealth of the Northern Mariana Islands.").)

intended to displace or eliminate Plaintiff.  To the contrary, such language suggests that Defendant Marianas Southern was being contracted to provide services that Plaintiff would or could not provide within the market—*i.e.*, increasing competition within a market otherwise monopolized by Plaintiff.

Second, the justification letter, while critical of Plaintiff's alleged activities, does not provide sufficient factual material to conclude that Defendants intended to harm or restrain trade or commerce.  The text of the justification letter expressly notes that (1) Plaintiff is the sole provider of commercial passenger flight travel within the Northern Mariana Islands; (2) Plaintiff curbed its services to Tinian and Rota with little to no notice; and (3) Plaintiff previously has cancelled flights due to "unanticipated airline or aircraft predicaments."  (*Id.*, Ex. E, at 29-30.)  But the remainder of the letter contradicts any suggestion that Defendant Marianas Southern's contracted-for services were intended to drive Plaintiff out of the market.  Defendants' services were to be "a *secondary* accommodation option and *additional* flight schedule for travel into the island of Saipan transiting from the island of Guam," a solution for providing "immediate and critical inter-island travel *alternatives* to safeguard the health and safety of Tinian and Rota," and a means of overcoming the "lack of resources, staffing, and capacity" hampering reliable service to Tinian and Rota after extended, unfruitful discussions with Plaintiff—and *not* to "duplicate any previously performed work or services."  (*Id.* (emphasis added).)

Given such language, without further allegations based on conduct and state of mind outside of the four corners of the contract and accompanying documents—and Plaintiff alleges none—Plaintiff's allegations fall short of setting forth a basis for drawing the plausible inference that Defendants intended to harm or restrain trade or commerce as required for a section 1 claim.

1    Therefore, all of Plaintiff's section 1 claims against each Defendant (Counts I, III, and V) must be

2    dismissed for failure to state a claim. *Balistreri*, 901 F.2d at 699; *Fleming*, 581 F.3d at 925.

3        **b.  Section 2 Claims (Counts II, IV, VI)**

4        Plaintiff's claims, alleging that Defendants engaged in monopolization and attempted

5    monopolization, fall under section 2 of the Sherman Antitrust Act. *Verizon Commc'ns Inc. v. Law*

6    *Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Alaska Airlines, Inc. v. United*

7    *Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir. 1991) (identifying monopolization and attempted

8    monopolization claims as "the two traditional grounds for relief" under section 2, with attempted

9    monopolization "aris[ing] when the danger of monopolization is clear and present, but before a

10   full-blown monopolization has necessarily been accomplished"). A monopolization claim

11   "requires, in addition to the possession of monopoly power in the relevant market, 'the willful

12   acquisition or maintenance of that power as distinguished from growth or development as a

13   consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns*,

14   540 U.S. at 407 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)); *see also*

15   *Epic Games*, 67 F.4th at 998 (discussing two-step analysis for monopolization claims). As to a

16   claim for attempted monopolization, there must be allegations establishing "(1) that the defendant

17   has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and

18   (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*,

19   506 U.S. 447, 456 (1993). "For both claims, [a plaintiff] must . . . plausibly allege that the

20   defendant engaged in anticompetitive conduct to achieve (or attempt to achieve) monopoly power

21   and caused antitrust injury." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1067

22   (9th Cir. 2025); *accord Alaska Airlines*, 948 F.2d at 541-42 ("[T]he elements of attempted

23

24

1  monopolization, like the elements of monopolization, emphasize monopoly power and the

2  acquisition or perpetuation of this power by illegitimate 'predatory' practices.").

3      Here, Defendants' alleged conduct is the setting of ticket prices for inter-island commercial

4  passenger air travel at artificially low rates, with Defendants able to absorb any losses they would

5  otherwise suffer on the market by virtue of the federal funding guaranteed under the contract with

6  the Commonwealth.  (FAC ¶¶ 17, 28-33, 41.)  For such conduct to constitute predatory pricing—

7  and thus, anticompetitive conduct—forbidden by section 2 of the Sherman Antitrust Act, Plaintiff's

8  allegations must plausibly establish "two prerequisites":  first, that "the prices complained of are

9  below an appropriate measure of its rival's costs"; and second, that "the competitor had . . . a

10  dangerous probability[] of recouping its investment in below-cost prices."  *Brooke Grp. Ltd. v.*

11  *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

12      Setting aside the Parties' dispute concerning what Plaintiff must allege at a minimum to

13  establish "an appropriate measure of [Defendants' costs]" (*see* Defs.' Mot. 11; Pl.'s Opp'n 8-9;

14  Defs.' Reply 5-6), Plaintiff's allegations fail to set forth any plausible basis for concluding that

15  Defendants enjoyed "a dangerous probability[] of recouping [their] investment in below-cost

16  prices."  *Brooke Grp.*, 509 U.S. at 224.  The Supreme Court has explained:

17          "For its investment to be rational, the predator must have a
            reasonable expectation of recovering, in the form of later monopoly
18          profits, more than the losses suffered." [*Matsushita Elec. Indus.
            Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).]
19          Recoupment is the ultimate object of an unlawful predatory pricing
            scheme; it is the means by which a predator profits from predation.
20          Without it, predatory pricing produces lower aggregate prices in the
            market, and consumer welfare is enhanced.  Although unsuccessful
21          predatory pricing may encourage some inefficient substitution
            toward the product being sold at less than its cost, unsuccessful
22          predation is in general a boon to consumers.

23          That below-cost pricing may impose painful losses on its
            target is of no moment to the antitrust laws if competition is not
24          injured:  It is axiomatic that the antitrust laws were passed for "the

26

protection of *competition*, not *competitors*."   [*Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).]

*Brooke Grp.*, 509 U.S. at 224.  Plaintiff's allegations merely complain of losses to Plaintiff (*see* FAC ¶ 42) without any mention of Defendants' pricing activities beyond what is set forth in the contract and accompanying documents (*see id.* ¶¶ 31-33) and a statement by Defendant Stewart about apparent savings to consumers (*id.* ¶ 41).   None of Plaintiff's allegations even begin to suggest that Defendants did or were able to raise their prices above the contract's alleged below-cost prices during the period when Defendants "existed as the main competitor to Star Marianas in the CNMI," *i.e.*, "[b]eginning August 2022 until April 2023"—a period within the contract's effective term.  (*Id.* ¶ 16; *id.*, Ex. A, at 4 ("This contract will remain in effect for a two-year period beginning on the date the Notice to Proceed was issued."); *id.*, Ex. B, at 22 ("Notice to Proceed" dated March 21, 2022), ECF No. 34-1.)  And although Plaintiff alleges (once per count) that "Defendants possessed market power in the CNMI's air carrier market, and working together became direct competitors of Star Marianas in the CNMI's air carrier travel business" (FAC ¶¶ 45, 54, 64, 83, 103, 123), such allegations are unaccompanied by any other factual material elucidating the extent of Defendants' market power such that the Court could draw the reasonable, plausible inference that Defendants "obtain[ed] enough market power to set higher than competitive prices, and then [could] sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."  *Brooke Grp.*, 509 U.S. at 225-26 (quoting *Matsushita*, 475 U.S. at 590-91).  In this case, the contract with the Commonwealth expired in 2024, prior to Plaintiff's filing this lawsuit.  Yet Plaintiff's First Amended Complaint fails to allege any facts showing Defendants' efforts toward recoupment—even though the Supreme Court has unequivocally explained that "[r]ecoupment is the ultimate object of an unlawful predatory pricing scheme."  *Brooke Grp.*, 509 U.S. at 224.

27

Because the First Amended Complaint fails to allege facts to even begin to indicate that Defendants were able to recoup their losses or otherwise had a dangerous probability of recoupment, Plaintiff's allegations fail to state both monopolization and attempted monopolization claims under section 2 of the Sherman Antitrust Act.  Therefore, all of Plaintiff's section 2 counts against all Defendants (Counts II, IV, and VI) must be dismissed.  *Balistreri*, 901 F.2d at 699; *Fleming*, 581 F.3d at 925.

**C.  Leave to Amend**

"[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  Here, Plaintiff requests leave to amend its First Amended Complaint.  (Pl.'s Opp'n 12-13 (asserting that Plaintiff is able to set forth additional allegations on recoupment and attempted recoupment); *id.* at 20-21 (requesting leave to amend to substitute sections 1 and 2 with section 3).)  This is the first time that Plaintiff's claims are being dismissed for failure to state a claim.  The Court notes Defendants' arguments asserting that Plaintiff's claims must still fail due to the short duration and nature of the contract underlying this litigation being insufficient as a matter of law to establish exclusionary conduct (*see* Defs.' Mot. 6-7; Defs.' Reply 2-3); however, at this juncture, it does not appear that Plaintiff would be unable to cure the pleading defects identified herein with further factual allegations—allegations that may possibly also address Defendants' conduct in light of the duration and nature of the contract.[12]  Therefore, the Court is bound by precedent to afford Plaintiff leave to amend.

---

[12] Furthermore, it is unclear whether Defendants' cited cases on contractual length and nature are on all fours with the facts of this case, as Defendants' cited cases arise in the context of "exclusive dealing" and Plaintiff's claims turn not on the contract unto itself as a means of excluding Plaintiff from the commercial passenger air travel market, but rather on Defendants' alleged predatory pricing.

## IV.    CONCLUSION

The Court has jurisdiction to adjudicate Plaintiff's claims under the Sherman Antitrust Act; however, the First Amended Complaint fails to allege sufficient facts to support Plaintiff's claims under sections 1, 2, or 3 of the Act.  For the foregoing reasons, Defendant Southern Airways's Motion for Judgment on the Pleadings (ECF No. 80), as joined by Defendants Marianas Southern and Keith Stewart, is GRANTED.  Plaintiff's First Amended Complaint (ECF No. 34) is DISMISSED in its entirety WITH LEAVE TO AMEND.[13]  Should Plaintiff desire to file a second amended complaint, Plaintiff shall file such pleading, curing all deficiencies as identified in this order, by **March 23, 2026**.  Defendants will file responsive motions or pleadings to Plaintiff's second amended complaint in accordance with Rule 15(a)(3) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED this 9th day of March, 2026.

_____

RAMONA V. MANGLONA
Chief Judge

---

[13] The Parties' Stipulated Motion to Reset Expert Discovery Deadlines (ECF No. 94) is DENIED AS MOOT.